**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| ABBVIE INC. ET AL., *Plaintiffs*, v. DREW H. WRIGLEY, in his official capacity as Attorney General of North Dakota, et al., *Defendants*. | No. 1:25-cv-00081 |
| ASTRAZENECA PHARMACEUTICALS LP, *Plaintiff*, v. DREW H. WRIGLEY, in his official capacity as Attorney General of North Dakota, et al. *Defendants*. | No. 1:25-cv-00182 |
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, *Plaintiff*, v. DREW H. WRIGLEY, in his official capacity as Attorney General of North Dakota, et al., *Defendants*. | No. 1:25-cv-00204 |

**PLAINTIFF PHRMA'S SUPPLEMENTAL BRIEF**

**BACKGROUND**

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") brought this lawsuit to challenge North Dakota House Bill 1473, codified at North Dakota Century Code §43-15.3-08(3) ("H.B. 1473").  H.B. 1473 requires manufacturers participating in the federal 340B Program to make 340B-priced sales under circumstances where they otherwise would not (and are free under federal law to so decline to sell).  After the parties filed cross-motions for summary judgment, the Court entered an order requiring "additional briefing by all Parties on the issue of standing, specifically enforcement and injury," and asking "the Parties to brief or give additional evidence specific to North Dakota" to aid in resolving the pending motions.  Order 3.[1]  PhRMA files this supplemental brief and the attached supplemental declaration in response to that order.

**ARGUMENT**

**I.      This Court Has Jurisdiction Over PhRMA's Lawsuit.**

To sue as a representative of its members in federal court, an association like PhRMA must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).  An association "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).  "In other words, when it comes to showing associational standing, one injured member is enough." *Female Athletes United v. Ellison*, 2025 WL 2682386, at *8 (D. Minn. Sep. 19, 2025).

---

[1] The order was entered as Docket Number 66 in No. 1:25-cv-81 (lead case).

"[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). At the pleadings stage, a plaintiff establishes standing by alleging facts showing that it has suffered or likely will suffer "[1] an injury in fact [2] that is fairly traceable to the challenged conduct of the defendant [3] and that will likely be redressed by a favorable decision." *Am. Farm Bureau Fed'n v. EPA*, 836 F.3d 963, 968 (8th Cir. 2016). The point of the Article III standing requirement is to ensure that the plaintiff has a sufficient "personal stake" in the case's outcome to justify a federal court's exercise of jurisdiction. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

PhRMA easily satisfies all three elements for each of the three claims it brought in the complaint. *See Webb v. Smith*, 936 F.3d 808, 814 (8th Cir. 2019) (requiring standing "for each claim"). The record makes pellucid that its members will suffer financial and regulatory injuries unless H.B. 1473 is enjoined, and those injuries are not only traceable to the challenged statute, but redressable by the requested relief. PhRMA's standing to seek relief is further apparent from the reality that H.B. 1473 imposes *criminal* penalties. *See* N.D. Cent. Code §43-15.3-08(3)(b).

### A.    PhRMA Has Standing to Bring Its Claims.

Article III "standing is usually easy to establish" when a plaintiff challenges "[g]overnment regulations that require or forbid some action by the plaintiff" (or its members). *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 913 (8th Cir. 2025) (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024)); *accord St. Paul Area Chamber of Com. v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006) ("When a statute is challenged by a party who is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute] has caused him injury.'"). "When a state or local law imposes compliance burdens on those it regulates or controls, and 'compliance is coerced by the threat of enforcement[,] … the controversy is both immediate and

2

real.'" *Keller v. City of Fremont*, 719 F.3d 931, 947 (8th Cir. 2013) (ellipsis in original) (quoting *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 508 (1972)).  Under those principles, standing is indeed "easy to establish" here, *Bird*, 157 F.4th at 913, as H.B. 1473 directly regulates what actions PhRMA's members can and cannot take within the confines of the 340B Program.

To start, H.B. 1473 injures PhRMA's members because it forbids them from engaging in conduct in which they would otherwise engage.  H.B. 1473 prohibits PhRMA's members from imposing one-contract-pharmacy and claims-data conditions, respectively, on their offers to sell 340B-priced drugs to 340B covered entities.  *See* Dkt.1-1 ("Compl.") ¶¶176-94[2]; *see also* N.D. Cent. Code §43-15.3-08(3)(b).  Those prohibitions unquestionably inflict concrete and particularized injury on PhRMA's members.  Before H.B. 1473 was enacted, "many PhRMA members" individually engaged in conduct that state law now proscribes—namely, "limit[ing] … the number of contract pharmacies to which the manufacturer will supply 340B-priced drugs" and requiring the provision of "claims data" as "condition[s] precedent" of sales at 340B prices. Compl. ¶11; *see also* Dkt.17-1 ("Stansel Decl.") ¶14; Dkt.17-3 ("Janco Decl.") ¶¶8-14.  H.B. 1473 makes those conditions unlawful, *see* Dkt.23 ("ND MSJ") 16-23, 43-44, and thus forces PhRMA's members to "act contrary to their [individually] established policies," *Arkansas v. EEOC*, 129 F.4th 452, 458 (8th Cir. 2025); *see also* Stansel Decl. ¶¶17-19; Janco Decl. ¶¶17-21.  That is injury in fact.  *See, e.g.*, *Minn. Chapter of Assoc. Builders & Contractors, Inc. v. Blissenbach*, 155 F.4th 1015, 1021 (8th Cir. 2025) ("Because the Contractors allege specific conduct that the Act targets, and because state officials have not disavowed enforcing it, the Contractors have standing."); *EEOC*, 129 F.4th at 457-58 (plaintiff had standing because allegedly unlawful rule forced it to

---

[2] Unless otherwise noted, all "Dkt." citations refer to docket entries in PhRMA's case, No. 1:25-cv-204.  "Lead Case Dkt." citations refer to docket entries in No. 1:24-cv-81.

3

offer accommodations it "otherwise would not provide"); *Arizona v. EPA*, 77 F.4th 1126, 1131 (D.C. Cir. 2023) (standing is "self-evident" when challenged law "constrain[s] what regulated parties may lawfully do").

The state has never disputed that H.B. 1473 imposes direct regulatory burdens on PhRMA's members. Quite the opposite: The state freely admits that H.B. 1473's "primary objective" is to regulate "manufacturers' restrictions on State-law contract-pharmacy arrangements"—*i.e.*, one-contract-pharmacy and claims-data conditions. ND MSJ 44. That is the end of the inquiry. Because "[t]he imposition of [that] regulatory burden itself causes injury," it is "unnecessary to consider" whether H.B. 1473 causes "any specific economic harms." *EEOC*, 129 F.4th at 458.

That said, H.B. 1473 undeniably causes PhRMA's members "economic harms," *id.*, which is the "prototypical" Article III injury, *Collins v. Yellen*, 594 U.S. 220, 243 (2021). "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 693 (8th Cir. 2017); *accord Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) (even "only a few pennies" is enough for standing). Here, H.B. 1473 forces PhRMA's members to "provide millions of dollars in incremental discounts each year that are not required under federal law," because every sale that a manufacturer makes at 340B prices causes the manufacturer to lose revenue it would otherwise make from sales at the commercial price. Janco Decl. ¶17. And H.B. 1473 "compel[s] 340B-priced transactions to take place that would not occur in the absence of H.B. 1473," Compl. ¶183; *see* Janco Decl. ¶¶15, 17, thereby "increasing dramatically manufacturers' cost of participation in 340B, Medicare, and Medicaid," Compl. ¶34; *see* Janco Decl. ¶¶15, 17. PhRMA's evidence that H.B. 1473 drastically increases the cost of participation in 340B for PhRMA's members establishes financial harm that confers Article III standing to bring all three claims. *See, e.g.*, *Alexis Bailly Vineyard, Inc. v. Harrington*,

4

931 F.3d 774, 777-80 (8th Cir. 2019) (Declaratory Judgment & Commerce Clause); *Keller*, 719 F.3d at 947-48 (Supremacy Clause); *Jones v. Gale*, 470 F.3d 1261, 1265-67 (8th Cir. 2006) (Commerce Clause).

Any remaining doubt that PhRMA's members face injury in fact is erased by the fact that H.B. 1473 carries criminal penalties. *See* N.D. Cent. Code §43-15.3-08(3)(b) (making it a "class B misdemeanor" to violate H.B. 1473's provisions). Black-letter law instructs that "[p]laintiffs need not expose themselves to actual arrest or prosecution if they legitimately possess more than an 'imaginary or speculative' fear of prosecution." *United Food & Chem. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 427 (8th Cir. 1988) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). And there is nothing "imaginary or speculative" about PhRMA's members' fears here, as evident from the state's position that H.B. 1473's "primary objective" is to regulate "manufacturers' restrictions on State-law contract-pharmacy arrangements." ND MSJ 44.

Indeed, far from assuaging them, the state's litigating positions have only confirmed the validity of PhRMA's members' fears. In its complaint, PhRMA offered a way to read H.B. 1473 as limited to regulating delivery, in which case the statute would not bar PhRMA's members' one-contract-pharmacy and claims-data policies, as those are conditions on when members will *sell* drugs at 340B prices, not conditions on where or how they will *deliver* them. *See* Compl. ¶¶143-62. As PhRMA explained, each of H.B. 1473's substantive restrictions applies only to a 340B "drug," as defined in the statute. *See, e.g.*, N.D. Cent. Code §43-15.3-08(3)(b) (prohibiting manufacturers from "[d]irectly or indirectly, deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] with the acquisition of a drug by a contract pharmacy on behalf of a covered entity"). And H.B. 1473 explicitly defines a "drug" to mean "a drug purchased under reduced pricing under

section 340B of the federal Public Health Service Act … by a covered entity." *Id.* §43-15.3-08(3)(a)(3). The statute thus could be read to apply only after a drug has already been "purchased" through the 340B Program at the federal 340B price, in which case H.B. 1473 would regulate only activities post-purchase, rather than whether manufacturers must sell drugs at the 340B price in the first place.

Instead of embracing that interpretation of H.B. 1473, however, the state derides that interpretation as "meritless" and "too-cute-by-half," and insists that it "would render H.B. 1473 a nullity." ND MSJ 43 (formatting altered). The state instead insists that its law *does* prohibit the conduct in which PhRMA's members wish to continue to engage. PhRMA thus has plainly established that its members engage in conduct that is at least "arguably … proscribed by" North Dakota law. *See Bird*, 157 F.4th at 914-15 (holding that an association had standing to bring a claim "under the Supremacy Clause" because its members' conduct was "arguably affected with a constitutional interest" and it was "'at least arguable at this stage of the litigation' that the [challenged] Act applies to [the members]"). So even if PhRMA lacked standing to claim that H.B. 1473 does *not* apply to its members' conduct, the state's insistence that H.B. 1473 *does* apply to its members' conduct ensures that PhRMA has standing to assert its claims under the Supremacy and Commerce Clauses. *See* pp.2-5, *supra*.

Finally, PhRMA's injuries are traceable to the defendants and redressable by a favorable resolution. "An injury is 'fairly traceable' to a challenged statute when there is a 'causal connection' between the two." *Harrington*, 931 F.3d at 779. That standard is "[t]ypically" satisfied when, as here, "the named defendants … possess the authority to enforce the complained-of provision." *Id.* PhRMA named the North Dakota Attorney General and members of the North Dakota Board of Pharmacy as the defendants to this action because they have authority to enforce

H.B. 1473's provisions. *See* Compl. ¶¶47-48; N.D. Cent. Code §43-15.3-09; *id.* §§54-12-01(2), 54-12-02. Because the named defendants all "possess the authority to enforce" H.B. 1473, the injuries are both traceable to them and would be redressed by a favorable decision barring them from enforcing the statute and declaring the statute unlawful. *Harrington*, 931 F.3d at 779.

### B.    PhRMA Faces a Credible Threat That the Defendants Will Enforce H.B. 1473.

The Court requested the parties to address whether "any enforcement has occurred since the statute went into effect July 1, 2025." Order 2. PhRMA is not aware of any actions brought by the defendants to enforce H.B. 1473. Regardless, that in no way defeats PhRMA's standing.

For one thing, black-letter law instructs that it is "unnecessary to consider" whether plaintiffs "face[] a credible threat of enforcement if they refused to comply" with the law when, as here, the challenged law's "imposition of a regulatory burden itself causes [an] injury." *EEOC*, 129 F.4th at 458. Although the prospect of enforcement threatens yet another injury traceable to the defendants, *see* p.5, *supra*, the financial harm and regulatory burden suffered by compliance suffice even without that threat, *see* pp.4-5, *supra* (collecting cases). Said otherwise, PhRMA need not establish a "present threat of enforcement" to establish standing, because, as explained, its members suffer direct financial and regulatory injuries on account of their obligation to comply with H.B. 1473's unlawful provisions. *See* pp.2-5, *supra*.

Regardless, PhRMA still faces a credible threat of enforcement even if the defendants have not yet brought any enforcement actions. Courts presume that state officials will faithfully enforce state law, especially when a law carries criminal penalties. Accordingly, "as long as there is no 'evidence—via official policy or a long history of disuse—that authorities' have 'actually' refused to enforce a statute, a plaintiff's fear of prosecution for illegal activity is objectively reasonable." *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020). Nothing in the state's briefing suggests that

the state has adopted an official policy of non-enforcement or that it has refused to enforce the statute.[3]

What is more, the defendants have not disavowed any intention of enforcing the law against PhRMA's members. Quite the opposite: They argue that the purpose of North Dakota's law is to prohibit the very contract-pharmacy and claims-data conditions that PhRMA's members seek to include in their offers to sell drugs at 340B prices. ND MSJ 44-45. And although they disavowed an intent to enforce the law as to the federal rebate model pilot program, *see* ND MSJ at 27 (collecting citations to declarations),[4] they have conspicuously refused to disavow enforcement as to one-contract-pharmacy and claims-data conditions. That is proof positive that PhRMA's members face a credible threat of enforcement should they cease complying with the law. *See, e.g.*, *St. Paul Area Chamber of Com.*, 439 F.3d at 485-86 (finding a credible threat where defendants "have not disavowed an intent to enforce the statutes in the future"); *Bird*, 157 F.4th at 915 ("[J]ust because Bird has 'no present plan' to enforce the Act against Doe or Roe does not mean that she would not enforce it against them in the future."); *see also United Food*, 857 F.2d at 429-30 (holding that a representation that the state had no "present intention" to enforce did not defeat jurisdiction, because the state's "position could well change").

## II. The Court Has Sufficient Evidence To Enter Judgment for PhRMA.

The Court directed the parties "to brief or give additional evidence specific to North Dakota," especially as it relates to "the structure of the system in North Dakota and if the lack of widespread pharmacy chains affects the impact of the law." Order 3.

---

[3] On the contrary, H.B. 1473 was recently enacted, further corroborating PhRMA's credible fear. *See St. Paul Area Chamber of Com.*, 439 F.3d at 486 ("threat of prosecution is greater under a statute enacted relatively recently").

[4] As PhRMA explained in its notice filed with the Court on March 10, 2026, *see* Lead Case Dkt.65, the pilot program does not provide a basis for enjoining H.B. 1473 at this time.

PhRMA's principal argument is that H.B. 1473 is invalid under the Supremacy Clause itself, separate and apart from the independent preemption problems that arise by virtue of the federal 340B statute.  The merit of PhRMA's claim is evident from the fact that H.B. 1473 treats drug manufacturers in North Dakota that do *not* participate in the 340B Program (and there is at least one, *see* Ex. A (Rowen Decl.) ¶¶2-3) more favorably than PhRMA members that *do* participate in 340B and do business in North Dakota, *see id.* ¶4, and from the legal reality that H.B. 1473 effectively rewrites the terms of a federal contract.  That provides an adequate basis to conclude that H.B. 1473 directly regulates the federal government and discriminates against "those with whom" it deals.  Dkt.16 ("PhRMA MSJ") 24; Dkt.38 (PhRMA MSJ Resp. & Reply) 11-22.

As to PhRMA's "traditional field and conflict preemption" arguments, no further factual development is necessary because the preemption problems arise from the face of the state and federal statutes.  The record demonstrates that PhRMA has members in North Dakota that seek to impose one-contract-pharmacy and claims-data conditions on their offers to sell drugs to North Dakota covered entities at 340B prices.  *See* Stansel Decl. ¶¶7-9, 13-19; Janco Decl. ¶¶8-21.  By forbidding PhRMA's members from doing so, H.B. 1473 intrudes "upon the exclusive federal field created by 340B," Compl. ¶166, unlawfully "expand[s] the scope of manufacturers' 340B obligations," *id.* ¶183, prevents manufacturers from "being able to meaningfully utilize the exclusive federal resolution process that Congress created" to safeguard Program integrity, *id.* ¶190, and interferes with the exclusive "federal enforcement regime" for that program, *id.* ¶196.

Finally, the fact that "[t]here are no Walgreens pharmacies in the State," Order 3, is beside the point.  Under H.B. 1473, PhRMA's members are required, on pain of criminal sanction, to provide 340B pricing to for-profit pharmacies physically located *in other states* whenever those pharmacies contract with covered entities in North Dakota to dispense drugs to the covered entities'

9

patients.  That is not a small universe.  One report estimates that *a majority* of pharmacy locations that have contracts with North Dakota covered entities to dispense drugs to the covered entities' patients are located outside of North Dakota.  *See* Ex. A (Rowen Decl.) ¶5.  And publicly available HRSA records tell much the same story, showing that 274 of the 549 (49.9%) pharmacy contracts with North Dakota covered entities are with pharmacies located in *other* states, including in states as far-flung as South Carolina.  *Id.* ¶11; *see id.* ¶¶6-12.  That includes 15 contracts with Walgreens pharmacies in Arizona, Michigan, Minnesota, Pennsylvania, and Texas.  *Id.* ¶13.

As that data confirms, the unfortunate reality is that this case is not just about "North Dakota pharmacies."  *Contra* Order 3.  It is also about North Dakota effectively requiring out-of-state manufacturers and out-of-state distributors to give reduced pricing to out-of-state pharmacies on the theory that those out-of-state pharmacies are just acting as the agents of covered entities in North Dakota.  H.B. 1473 directly "regulate[s] transactions between drug manufacturers and distributors occurring out of state."  PhRMA MSJ 43.  Indeed, on *that* critical point, there is no genuine dispute.  "Except in rare circumstances, drug manufacturers do not distribute drugs directly to pharmacies."  Dkt.17-2 (O'Harra Decl.) ¶10.  "Instead, pharmacies purchase drugs from distributors."  *Id.*  As it relates to this litigation, "[m]any [PhRMA] members … provide 340B-priced drugs through drug distributors located outside of North Dakota who then sell these drugs to Covered Entities nationwide, including in North Dakota."  Stansel Decl. ¶10.  Together, the record provides undisputed evidence that H.B. 1473 unlawfully regulates out-of-state transactions, entitling PhRMA to judgment on its Commerce Clause claim.  *See* Compl. ¶¶201-13.

Respectfully submitted,

Ryan C. McCamy, ND ID #06420                    /s/ Erin E. Murphy
Conmy Feste Ltd.                                 ERIN E. MURPHY*
3369 45th Street                                 MATTHEW D. ROWEN*
South Fargo, ND 58104                            PHILIP HAMMERSLEY*
Telephone: (701) 293-9911                        CLEMENT & MURPHY, PLLC
rmccamy@conmylaw.com                             706 Duke Street
                                                 Alexandria, VA 22314
                                                 (202) 742-8900
                                                 erin.murphy@clementmurphy.com
                                                 matthew.rowen@clementmurphy.com
                                                 philip.hammersley@clementmurphy.com

                                                 * admitted pro hac vice

                                *Counsel for PhRMA*

March 23, 2026